**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **JANET MILLEVILLE,** | ) | |
| **o/b/o S.P.M., A Minor Child** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 4:12CV 27 LMB** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

This is a proceeding under 42 U.S.C. § 405(g) for judicial review of the defendant's final decision denying Janet Milleville's application for Supplemental Security Income benefits on behalf of her grandson, S.P.M., under Title XVI of the Social Security Act. This case has been assigned to the undersigned United States Magistrate Judge pursuant to the Civil Justice Reform Act and is being heard by consent of the parties. <u>See</u> 28 U.S.C. § 636(c). Plaintiff has filed a Brief in Support of Complaint (Document Number 11), and defendant has filed a Brief in Support of the Answer (Doc. No. 16).

## Procedural History

Ms. Milleville filed an application for Supplemental Security Income (SSI) benefits on behalf of S.P.M. on November 29, 2007, alleging an onset of disability date of March 1, 2004. (Tr. 87-89). The application was denied initially and, following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated

April 21, 2010. (Tr. 55-59, 12-28). Ms. Milleville thereafter filed a request for review with the Appeals Council of the Social Security Administration (SSA), which was denied on November 8, 2011. (Tr. 9, 1-4). Thus, the decision of the ALJ stands as the final decision of the Commissioner. See 20 C.F.R. §§ 404.981, 416.1481.

## Evidence Before the ALJ

### A.    ALJ Hearing

Plaintiff's administrative hearing was held on September 30, 2009. (Tr. 34). Plaintiff was present and was represented by counsel. (Id.). Also present was plaintiff's mother, Bonnie Carter. (Id.).

Plaintiff's attorney made an opening statement, in which he indicated that plaintiff has attention deficit hyperactive disorder (ADHD) and bipolar disorder. (Tr. 36). Plaintiff's attorney stated that plaintiff's impairments prevent him from remaining on task, and cause him to hurt people and animals. (Id.). Plaintiff's attorney stated that plaintiff has marked and extreme limitations, which are disabling. (Id.).

The ALJ examined plaintiff's mother, Ms. Carter, who testified that she lived with her son and her husband. (Tr. 37). Ms. Carter stated that her son is eleven years of age. (Id.). Ms. Carter testified that she applied for benefits on behalf of her son because he gets out of control, anxious, nervous, "gets an attitude," and cannot stay on task. (Id.).

Ms. Carter stated that plaintiff has gone from the "A" honor roll to earning "D"s and "F"s. (Id.). Ms. Carter testified that plaintiff is in the sixth grade. (Id.). Ms. Carter stated that plaintiff has never appeared in juvenile court, nor has he repeated a grade. (Tr. 38).

Ms. Carter testified that her family lives in a mobile home that sits on four acres. (Id.). Ms. Carter stated that she rents the mobile home, and that a housing agency pays for half of her rent. (Id.). Ms. Carter testified that her family's source of income is Social Security Disability and Social Security Income. (Tr. 39). Ms. Carter stated that she and her husband both receive disability benefits. (Id.). Ms. Carter testified that the family also receives food stamps. (Id.). Ms. Carter stated that plaintiff receives Medicaid benefits. (Id.).

Ms. Carter testified that plaintiff saw Clayton Davis for a one-time consultation. (Tr. 40). Ms. Carter stated that plaintiff has seen three to four psychiatrists, and he has seen a counselor. (Tr. 41). Ms. Carter testified that plaintiff saw the counselor, Nathan Lundin, eight to ten times but he stopped going over a year prior to the hearing because plaintiff would not talk to him. (Id.). Ms. Carter stated that plaintiff continues to see psychiatrist Dr. Michael Kent. (Id.).

Ms. Carter testified that plaintiff was hospitalized on one occasion in 2006 or 2007 for his psychiatric impairments. (Tr. 42).

Plaintiff's attorney next examined Ms. Carter, who testified that it is difficult to get plaintiff up in the morning and get him ready for school. (Id.). Ms. Carter stated that she has to continually ask plaintiff to get dressed, brush his teeth, and get ready, and that they argue every morning. (Id.). Ms. Carter testified that she repeatedly tells plaintiff to do chores after school, but he will not do them. (Tr. 43). Ms. Carter stated that plaintiff stomps, runs down the hallway, and screams if he does not get his way. (Id.).

Ms. Carter testified that plaintiff has had three or four physical altercations with her husband. (Id.). Ms. Carter stated that she has been married six years. (Id.). Ms. Carter testified

that, on one occasion, plaintiff punched and kicked her husband because he did not want to go to school. (Tr. 44).

Ms. Carter stated that plaintiff picked a fight with a fifth grader when he was in kindergarten. (Id.). Ms. Carter testified that plaintiff has also had verbal altercations with other children. (Id.).

Plaintiff's attorney indicated that plaintiff's medical records noted an incident plaintiff had with puppies. (Tr. 45). Ms. Carter testified that plaintiff was at his father's home and wanted to bring a puppy to her home. (Id.). Ms. Carter stated that, when plaintiff was told he could not bring the puppy home, he tried to drown the puppies in a pool. (Id.).

Ms. Carter testified that plaintiff wrestles with her small dog and makes him yelp and cry. (Id.).

Ms. Carter stated that plaintiff takes Tenex,[1] Lithium,[2] Celexa,[3] and a "stomach pill." (Tr. 46). Ms. Carter testified that plaintiff does not willingly take his medication. (Id.). Ms. Carter stated that she has to struggle with plaintiff for about twenty minutes to get him to take his medication. (Id.).

Ms. Carter testified that the night before the hearing plaintiff told her that he had acted like so many people that he did not know who he was. (Id.). Ms. Carter stated that she found this

---

[1]Tenex is indicated for the treatment of ADHD. See WebMD, http://www.webmd.com/drugs (last visited February 8, 2013).

[2]Lithium is indicated for the treatment of bipolar disorder. See WebMD, http://www.webmd.com/drugs (last visited February 8, 2013).

[3]Celexa is indicated for the treatment of depression. See Physician's Desk Reference (PDR), 1161 (63rd Ed. 2009).

remark troubling.  (Tr. 47).

Ms. Carter testified that plaintiff has told her that he hears voices on a couple occasions. (Id.).  Ms. Carter stated that plaintiff has reported this to his psychiatrist.  (Id.).

Ms. Carter testified that plaintiff sees his biological father, who is an alcoholic.  (Id.).

Ms. Carter stated that plaintiff will not do homework.  (Tr. 48).  Ms. Carter testified that she has tried to force plaintiff to do his homework, but she has given up.  (Id.).

Ms. Carter stated that plaintiff was on the honor roll in third and fourth grade but he currently receives "D"s and "F"s.  (Id.).  Ms. Carter testified that plaintiff changed schools around this time.  (Id.).  Ms. Carter stated that plaintiff became angry and mean when he changed schools, and that he wanted to return to his old school.  (Id.).  Ms. Carter testified that she sent plaintiff back to his old school, but his behavior did not change.  (Tr. 49).

Ms. Carter stated that plaintiff will not do chores even if she gives him instructions and reminds him.  (Id.).  Ms. Carter testified that plaintiff loses his train of thought and wanders off. (Id.).  Ms. Carter stated that the only chore plaintiff can concentrate on performing is picking up cigarette butts.  (Id.).  Ms. Carter indicated that she pays plaintiff ten cents for each cigarette butt he picks up.  (Id.).  Ms. Carter testified that she occasionally has to supervise plaintiff while he performs this chore, and plaintiff sometimes performs it without being asked.  (Id.).

Ms. Carter stated that plaintiff goes to bed on a regular basis.  (Id.).

Ms. Carter testified that, for the past six to seven months, plaintiff has been staying in his room from the time he gets home from school until the time he goes to bed.  (Tr. 50).  Ms. Carter stated that plaintiff is not forced to stay in his room.  (Id.).  Ms. Carter testified that plaintiff

watches television and movies, plays video games, and listens to music. (Id.). Ms. Carter stated that plaintiff is able to concentrate on watching a movie or playing a game if it is a "good" movie or game, but he screams if it is not going well. (Id.).

Ms. Carter testified that plaintiff screams and kicks the trash can when he is asked to take out the trash. (Tr. 51).

Ms. Carter stated that plaintiff talks to friends on the phone and attends Youth Group. (Id.). Ms. Carter testified that plaintiff had only been attending Youth Group for one month, and he had not gotten into any trouble there yet. (Id.).

The ALJ indicated that he was placing the case in post-development status. (Id.). The ALJ requested that plaintiff's attorney obtain the following evidence: records from counselor Lundin; records from plaintiff's psychiatric hospitalization; and a complete, up-to-date school transcript. (Tr. 52). The ALJ also indicated that he would request a psychological evaluation with testing. (Id.).

## B.    **Relevant Medical Records**

The record reveals that plaintiff received counseling services from Nathan E. Lundin, MA, from February 2006 through December 2007. (Tr. 281-93). In February 2006, it was noted that plaintiff was taking Adderall[4] and Risperdal.[5] (Tr. 289). In March 2006, Mr. Lundin noted that plaintiff's mood had improved, although plaintiff reported concerns about getting along with his father and stepfather. (Tr. 286-87).

_____

[4]Adderall is indicated for the treatment of ADHD. See PDR at 3013.

[5]Risperdal is indicated for the treatment of schizophrenia. See PDR at 1754.

On October 5, 2006, Katie Jones, MA, at Crider Center for Mental Health conducted a Child & Family Assessment, upon referral by plaintiff's school counselor. (Tr. 203-20). Plaintiff's mother reported disruptive behavior, including physical aggression, problems with authority, property damage, theft, and cruelty to animals. (Tr. 204). Plaintiff was not taking medication at the time, but he had taken Adderall and Risperdal in the past six months. (Tr. 213). When asked why he thought he was referred for services, plaintiff responded "because I am evil." (Tr. 215). Upon mental status examination, Ms. Jones found that plaintiff was oriented to time and place, plaintiff was cooperative but arrogant, his memory was normal, and his judgment appeared appropriate. (Tr. 217). Ms. Jones diagnosed plaintiff with oppositional defiant disorder[6] and attention deficit hyperactivity disorder. (Tr. 218). Ms. Jones assessed a current GAF score of 55,[7] with the highest GAF score in the past year of 58. (Id.). Ms. Jones stated that plaintiff would benefit from the school based mental health services. (Tr. 217). Plaintiff was to work on his behavior in the classroom and at home by gaining listening skills, anger management skills, and organization skills. (Id.). Ms. Jones noted that plaintiff had previously been diagnosed with ADHD and had been on Adderall. (Tr. 218). Plaintiff was taken off his medication by his father. (Id.). Ms. Jones stated that plaintiff has difficulty staying on task and is easily distracted. (Id.). Ms. Jones stated that plaintiff's social and academic functioning has been impaired by his

---

[6]A disorder of childhood or adolescence characterized by a recurrent pattern of negativistic, hostile, and disobedient behavior toward authority figures. Stedman's Medical Dictionary, 570 (28th Ed. 2006).

[7]A GAF score of 51-60 denotes "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Diagnostic and Statistical Manual of Mental Disorders (DSM-IV), 32 (4th Ed. 1994).

behaviors, and that the behaviors had been occurring for the past two years. (Id.). Ms. Jones noted that plaintiff initiates conversations at inappropriate times, touches things he is not supported to touch, and talks excessively. (Id.).

A School Based Mental Health Specialist ("MHS") Child & Family Plan was developed on October 23, 2006. (Tr. 221-24). It was noted that plaintiff was admitted because he was disruptive in class and it was impacting his learning difficulty in class. (Tr. 221). The objectives were listed as assisting plaintiff in getting a tutor or after school help; to practice the study skills after learning the skills; to monitor plaintiff functioning at home weekly; to assist plaintiff in finding a psychiatrist and therapist; to teach plaintiff appropriate behaviors (social skills); and to monitor plaintiff's classroom once a week. (Tr. 222-24). On April 13, 2007, Ms. Jones noted that goals were achieved and the family no longer wanted to participate in MHS services. (Tr. 227).

Plaintiff presented to Ashok Yanamadala, M.D. on December 4, 2006, at which time it was noted that plaintiff needed medication. (Tr. 241). Dr. Yanamadala prescribed Adderall and Risperdal. (Tr. 243). Plaintiff continued to see Dr. Yanamadala for medication management through October 2007. (Tr. 233-40).

Plaintiff presented to St. Joseph Health Center on May 20, 2007, at which time it was noted that plaintiff had been off his medications for two days and was "out of control." (Tr. 334). Plaintiff's medications were refilled. (Id.).

On May 24, 2007, Dr. Yanamadala noted that plaintiff was disrespectful, and was experiencing mood swings. (Tr. 237). Dr. Yanamadala described plaintiff's mood as labile. (Id.).

Dr. Yanamadala started plaintiff on Depakote.[8]  (Id.).  In July 2007, Dr. Yanamadala noted that plaintiff was "doing fine."  (Tr. 233).

Plaintiff presented to the emergency room at SSM Health Care on May 20, 2007, at which time he was out of control and agitated.  (Tr. 334).  Plaintiff had been out of medications for two days and needed his medications refilled.  (Id.).  Plaintiff was prescribed Adderall and Risperdal. (Id.).

Plaintiff was hospitalized from November 7, 2007, through November 10, 2007 after threatening to harm a teacher at school.  (Tr. 361).  Plaintiff had been suspended after threatening to hurt the teacher with a sledge hammer, breaking his eyeglasses, and leading him into a casket. (Id.).  Plaintiff did not appear to show any remorse regarding this incident.  (Id.).  Plaintiff admitted that he threatened to kill himself and the teacher together.  (Id.).  It was noted that plaintiff tied a seat belt around his neck, and made gestures of stabbing a pencil through his chest. (Tr. 401).  Plaintiff also tried to hurt his mother and others.  (Id.).  Plaintiff had sudden mood swings and anxiety every day.  (Id.).  Plaintiff had been seeing Dr. Yanamadala for his anger problems, stress, and violent behaviors.  (Tr. 361).  Plaintiff had run away from home and had been involved with the police.  (Id.).  Saaid Khojasteh, M.D. found that plaintiff was a danger to himself and others.  (Tr. 402).  Plaintiff received medication management during his hospitalization until he was stabilized.  (Tr. 361).  Plaintiff received individual and group counseling, anger management and behavior modification.  (Id.).  Plaintiff's mood and behavior improved to the extent he was safe to be discharged.  (Id.).  Plaintiff's discharge diagnoses were

_____

[8]Depakote is indicated for the treatment of manic or mixed episodes associated with bipolar disorder.  See PDR at 423.

impulse control disorder, ADHD, and probable bipolar disorder, with a GAF score of 50.[9] (<u>Id.</u>). Plaintiff's discharge medications were Depakote and Tenex. (<u>Id.</u>). Dr. Khojasteh referred plaintiff to Catholic Family Services, and noted that plaintiff must see a psychiatrist. (<u>Id.</u>).

Plaintiff presented to Catholic Family Services on December 7, 2007, with reports of "outrage, anger, uncontrollable." (Tr. 246). Upon mental status exam, plaintiff had a sullen demeanor. (Tr. 247). Plaintiff was diagnosed with generalized anxiety disorder, with a GAF score of 50. (<u>Id.</u>). Plaintiff's medications were continued. (<u>Id.</u>).

Plaintiff saw Mr. Lundin on December 10, 2007. (Tr. 281). It was recommended that a police officer talk to plaintiff about his behavior the past two weeks. (<u>Id.</u>).

On December 20, 2007, plaintiff underwent a Child & Family Assessment at Crider Health Center. (Tr. 312). When asked how he had been feeling, plaintiff reported "mad, angry and sorta breaking the rules." (<u>Id.</u>). Plaintiff's mother reported that plaintiff had been physically aggressive, had problems with authority, had problems with theft, and was cruel to animals. (Tr. 313). Plaintiff was scared of the dark and of being alone because he was afraid someone would take him. (<u>Id.</u>). Plaintiff had mood swings daily, anxiety, irritability, increased energy, uncontrolled anger, was isolative, depressed, and withdrawn. (<u>Id.</u>). Pamela Fox, MA, observed that plaintiff seemed very angry at other kids and said that he wanted to hurt them, but he had no real plan to do it. (Tr. 323). Plaintiff also reported suicidal thoughts about hanging himself. (<u>Id.</u>). Ms. Fox found that plaintiff's memory was very good and his recall was excellent. (Tr.

---

[9]A GAF score of 41 to 50 indicates "serious symptoms" or "any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." <u>DSM-IV</u> at 32.

324). Plaintiff's judgment was normal. (Id.). Plaintiff was irritable and argumentative, and acted as though the evaluation were a waste of his time. (Tr. 325). Plaintiff's thought process was normal. (Id.). Plaintiff exhibited some "magical thinking," about being a wrestler or rock star/rapper. (Tr. 326). Ms. Fox found that plaintiff's intellect was above normal and described plaintiff as "very smart." (Id.). Ms. Fox noted concerns regarding the seriousness of comments plaintiff made regarding hurting himself and others. (Id.). Ms. Fox diagnosed plaintiff with bipolar disorder and ADHD, with a current GAF score of 50 and the highest GAF score in the past year of 55. (Id.). Ms. Fox stated that plaintiff has a lot of difficulty managing his actions and behavior and needs to learn strategies to help him express his feelings in more appropriate ways. (Tr. 327). Ms. Fox stated that plaintiff also has a lot of trouble respecting authority and frequently gets in power struggles with them. (Id.). She indicated that plaintiff is extremely intelligent and believes he must act the way he does, which will make it hard to get him to change his current way of dealing with problems. (Id.). Ms. Fox expressed the opinion that plaintiff needs a structured, consistent environment that will allow him to learn how to express his feelings safely. (Id.). Ms. Fox noted that plaintiff was currently taking medication and that plaintiff's mother reports plaintiff is "like the devil" when not taking medication. (Tr. 328).

On December 27, 2007, Ms. Fox authored "Critical Intervention Strategies." (Tr. 311). Ms. Fox indicated that a specific predictor of psychiatric decompensation for plaintiff was anxiety about a situation where students were bullying or making fun of plaintiff and he was very paranoid and needed control. (Id.). Plaintiff threatened to kill himself or someone else. (Id.). Interventions were discussed. (Id.).

On February 26, 2008, state agency psychologist Judith McGee, Ph.D. completed a Childhood Disability Evaluation Form. (Tr. 250-54). Dr. McGee found that plaintiff's ADHD and bipolar disorder were severe but did not meet, medically equal, or functionally equal the listings. (Tr. 250). Dr. McGee expressed the opinion that plaintiff had less than marked limitation in the domains of Attending and Completing Tasks, Interacting and Relating with Others, and Caring for Yourself; and no limitation in the domains of Acquiring and Using Information, Moving About and Manipulating Objects, and Health and Physical Well-Being. (Tr. 252).

Plaintiff underwent an Annual Youth Update Assessment at Crider Health Center on December 9, 2008. (Tr. 298-305). Plaintiff's presenting problems were identified as behavioral/emotional concerns. (Tr. 298). Plaintiff denied any thoughts of harming himself or others. (Tr. 300). Plaintiff was pleasant and cooperative, his thought process was appropriate, and his attention was appropriate. (Tr. 301-03). Dr. Holeman diagnosed plaintiff with bipolar disorder and ADHD, with a GAF score of 55. (Id.). Dr. Holeman's recommendations for treatment goals were: social skills, communication skills, and anger management. (Tr. 303).

Plaintiff presented to Michael Kent, M.D. at Crider Health Center on July 24, 2009, for an initial psychiatric assessment. (Tr. 296-97). Plaintiff's chief complaint was described as longstanding problems with emotional lability and poor impulse control. (Tr. 296). Dr. Kent indicated that plaintiff tends to be oppositional when his wants are frustrated, but had not recently been out of control. (Id.). Plaintiff's overall mood was fair. (Id.). Plaintiff was reportedly emotionally and physically abused by his father. (Id.). Plaintiff's mother was bipolar. (Id.). Plaintiff reportedly could achieve grades but "quit trying," and did poorly in the past school year.

(Id.).  Plaintiff's medications were listed as Celexa, Tenex, Risperdal, Lithium, and Ranitidine.[10]

(Id.).  Dr. Kent described plaintiff as cooperative, gregarious, and spontaneous.  (Tr. 297).

Plaintiff's mood was good and his affect was bright and congruent with his mood.  (Id.).  Dr.

Kent diagnosed plaintiff with bipolar type I disorder,[11] stable; ADHD; and a GAF score of 60.

(Id.).  Dr. Kent continued plaintiff's medications.  (Id.).

On September 3, 2009, plaintiff underwent an annual MHS review.  (Tr. 306-10).  It was

noted that plaintiff continued to struggle with social skills, self-esteem issues, communication

issues, and possibly attachment issues.  (Tr. 309).  It was noted that MHS would continue to

work with school staff closely and would address appropriate anger management skills.  (Id.).

Plaintiff presented to Walter Clayton Davis, MA, LPC, for an evaluation on September 10,

2009.  (Tr. 263-67).  Mr. Davis noted that plaintiff had difficulties remaining focused throughout

the interview, required redirection, and periodically would get out of his seat to move around the

conference room.  (Tr. 266).  Plaintiff denied any thoughts of harming himself or others.  (Id.).

Plaintiff's mother reported that plaintiff had progressively been having more behavioral issues

with outbursts and attention span difficulties, with noticeable increase in problems since the third

grade.  (Id.).  Plaintiff's mother indicated that plaintiff had been having problems with peer

relations in the classroom as well as problems listening to instructions in the classroom, and that

his school considered holding him back one grade.  (Id.).  Plaintiff's mother indicated that plaintiff

had difficulties at home with regard to chores, homework, and redirection.  (Id.).  Plaintiff and his

---

[10]Ranitidine is indicated for treatment of gastric ulcer and GERD.  See PDR at 1672.

[11]An affective disorder characterized b the occurrence of alternating (e.g., mixed, manic, and major depressive) episodes.  Stedman's at 568.

mother reported the following symptoms: difficulty with maintaining focus on instructions/tasks; impulsiveness; verbal outbursts; inconsistent grades with drops in performance; mood swings; and aggressive behaviors. (Tr. 267). Mr. Davis diagnosed plaintiff with ADHD, bipolar depression, and assessed a GAF score of 40.[12] (Id.). Mr. Davis also completed a Mental Residual Functional Capacity Assessment, in which he expressed the opinion that plaintiff was markedly limited in the majority of areas assessed, and moderately limited in the remaining areas. (Tr. 263-64).

Plaintiff presented to Dr. Kent on October 15, 2009, at which time it was noted that plaintiff had received in-school suspensions and out -of-school suspensions for disruptive and aggressive or silly behaviors. (Tr. 329). Plaintiff admitted to getting angry quickly and then reacting before thinking. (Id.). It was noted that plaintiff's mood was labile, and that plaintiff would go from being fine to a very oppositional state, and then be fine again within minutes. (Id.). Upon examination, plaintiff's mood was "ok," his affect was euthymic, and plaintiff was at times silly and argumentative. (Id.). Plaintiff reported that his quick anger gets him in trouble. (Id.). Dr. Kent diagnosed plaintiff with bipolar type I disorder, labile; and ADHD. (Id.). Dr. Kent increased plaintiff's dosages of Lithium and Risperdal. (Id.).

Plaintiff saw David A. Lipsitz, Ph.D. for a psychological consultation at the request of the state agency on October 19, 2009. (Tr. 405-08). Dr. Lipsitz found that plaintiff was pleasant appearing and appeared in some acute distress. (Tr. 407). Plaintiff's affect was bright and his mood was one of anger. (Id.). Plaintiff tended to be somewhat impulsive and showed a flight of

---

[12]A GAF score of 31 to 40 denotes "[s]ome impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work...)." DSM-IV at 32.

ideas and push of speech, but there was no evidence of any significant suicidal ideations or impulses. (Id.). Dr. Lipsitz found that plaintiff's intellectual functioning appeared to be within the "borderline" range. (Id.). Plaintiff's short-term memory was deficient, his general range of knowledge appeared to be "quite narrow," and his knowledge of mathematic functions was poor. (Id.). Plaintiff's social awareness and judgment were poor, and plaintiff was unable to make adequate generalizations based on past social experiences. (Id.). Plaintiff's thought processes were primarily preoccupied with his anger, his mood swings, the "opposite sex," and his difficulty relating within society. (Id.). Dr. Lipsitz diagnosed plaintiff with bipolar disorder, oppositional defiant disorder, rule out ADHD, borderline intellect, and a GAF score of 50. (Id.). Dr. Lipsitz stated that plaintiff was "certainly in need of ongoing psychiatric treatment combining medication with individual psychotherapy and behavior management counseling within the home environment." (Id.).

C.    **School Records**

Plaintiff's report card for the school year ending June 2004 reveals that plaintiff either met or exceeded expectations in every subject except Spelling, in which it was noted plaintiff was "experiencing difficulty/requires additional practice." (Tr. 118).

For the 2004-2005 school year, plaintiff met expectations in all subjects except Reading and Writing/Language. (Id.).

For the 2006 school year, plaintiff met or exceeded expectations in every subject. (Id.).

For the 2007 school year, plaintiff's grades ranged from "A+" to "B-." (Tr. 118). Plaintiff's teachers commented that plaintiff was "working towards his full potential. He gets

- 15 -

along well with his classmates and is a joy to have in class." (Tr. 120). It was also noted that plaintiff was "doing well in all aspects of school. He comprehends lessons quickly. He is a bright student." (Id.). Finally, a teacher stated that plaintiff was "a brilliant child. He is learning to take responsibility for his choices. He is a thoughtful and humorous person and I loved having him in my class. I have no doubt he will do well in all that he does!" (Id.).


## The ALJ's Determination

The ALJ made the following findings:

1.  The claimant was born on December 22, 1997. Therefore, he was a school-age child on November 29, 2007, the date the application was filed, and is currently an adolescent (20 CFR 416.926a(g)(2)).

2.  The claimant has not engaged in substantial gainful activity since November 29, 2007, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3.  The claimant has the following severe impairments: attention deficit hyperactivity disorder; bipolar disorder; oppositional defiant disorder. (20 CFR 416.924(c)).

4.  The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5.  The claimant does not have an impairment or combination of impairments that functionally equals the listings (20 CFR 416.924(d) and 416.926a).

6.  The claimant has not been disabled, as defined in the Social Security Act, since November 29, 2007, the date the application was filed (20 CFR 416.924(a)).

(Tr. 18-28).

The ALJ's final decision reads as follows:

Based on the application for supplemental security income filed on November 29, 2007, the claimant is not disabled under section 1614(a)(3)(C) of the Social Security Act.

- 16 -

(Tr. 28).

## Discussion

**A.**    **Standard of Review**

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency. See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996). The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it. See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000). Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion. See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998). If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld. See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992). The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)). "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998). The analysis required has been described as a "searching inquiry." Id.

**B.**    **The Determination of Disability**

A child is considered disabled if that child "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations" and which lasts for a

period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i),(ii). The Commissioner has established a three-step process for determining whether a child is disabled under the Social Security Act. See 20 C.F.R. § 416.924. Under the first step, it is determined whether the child was engaged in substantial gainful activity. If substantial gainful activity is being performed, then a finding of no disability is warranted. See 20 C.F.R. §§ 416.924(b). Next, it is determined whether the child's impairments are severe. See 20 C.F.R. §§ 416.924(c). If a severe impairment is found, the next issue is whether the child's impairment meets or medically equals a listed impairment found in Appendix One to 20 C.F.R. 404. See 20 C.F.R. §§ 416.924(d); 20 C.F.R. pt. 404, subpt. P, App. 1. If it is determined that the impairment does not meet or medically equal a listing, then the final consideration is whether the child's impairment "functionally equals" a listed impairment. See 20 C.F.R. § 416.924(d).

An ALJ is to evaluate, in determining functional equivalence, a child's functional limitations in: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for himself/herself, and (6) health and physical well-being. See 20 C.F.R. § 416.926a (b)(1)(i)-(vi). A medically determinable impairment or combination of impairments functionally equals a listed impairment if it results in "marked" limitations in two domains or an "extreme" limitation in one domain. See 20 C.F.R. § 416.926a(d).

A "marked" limitation is a limitation which is "more than moderate" but "less than extreme." 20 C.F.R. § 416.926a (e)(2)(i). A "marked" limitation can also be "equivalent to standardized testing with scores that are at least two, but less than three, standard deviations

below the mean."  Id.

An "extreme" limitation is "more than marked," and is given "to the worst limitations,"
although it need not necessarily mean a total lack or loss of ability to function.  20 CF.R. §
416.926a(e)(3)(i).

## C.    Plaintiff's Claims on Appeal

Plaintiff first argues that the ALJ failed to fully and fairly develop the record.  Plaintiff next
contends that the ALJ failed to consider a structured setting.  Plaintiff finally argues that the ALJ
failed to properly consider plaintiff's failure to follow prescribed treatment.  The undersigned will
discuss plaintiff's claims in turn.

As previously stated, plaintiff contends that the ALJ failed to fully and fairly develop the
record.  Specifically, plaintiff argues that the ALJ should have obtained plaintiff's most recent
school records.  Plaintiff also argues that the ALJ should have obtained an opinion from plaintiff's
treating sources.  Finally, plaintiff contends that the ALJ erred in weighing the medical opinion
evidence.

"Because the social security disability hearing is non-adversarial, . . . the ALJ's duty to
develop the record exists independent of the claimant's burden in the case."  Stormo v. Barnhart,
377 F.3d 801, 806 (8th Cir. 2004).  This duty includes the ordering of a consultative examination
when such an evaluation is necessary for an informed decision.  Haley v. Massanari, 258 F.3d
742, 749 (8th Cir. 2001).  Although the ALJ "must neutrally develop the facts," the ALJ need not
"seek additional clarifying statements from a treating physician unless a crucial issue is
undeveloped."  Stormo, 377 F.3d at 806.  The ALJ also need not order a consultative

examination if the record contains substantial evidence to support the ALJ's decision. Haley, 258 F.3d at 749. If an ALJ fails to fairly develop the record, the court may remand for the taking of additional evidence. Hildebrand v. Barnhart, 302 F.3d 836, 838 (8th Cir. 2002). "'There is no bright line test for determining when the [Commissioner] has . . . failed to develop the record. The determination in each case must be made on a case by case basis.'" Gregg v. Barnhart, 354 F.3d 710, 712 (8th Cir. 2003) (quoting Battles v. Shalala, 36 F.3d 43, 44 (8th Cir. 1994)).

In this case, the ALJ instructed plaintiff's attorney to obtain an "up-to-date school transcript." (Tr. 52). In his decision, the ALJ acknowledged that the record contains reports from plaintiff and his mother of significant disciplinary issues resulting in in-school suspensions, out-of-school suspensions, detentions, and referrals; and reports by plaintiff's mother that plaintiff's grades are failing. (Tr. 20-21). The ALJ indicated that plaintiff's attorney had not submitted up-to-date school records as of the date of the decision. (Tr. 21). The ALJ stated that he had "drawn an adverse inference, noting that the missing school records must not support the allegations of the claimant's mother." (Id.). The ALJ pointed out that the school records that are in the evidence of record reveal that plaintiff was obtaining passing grades and was not a disciplinary concern. (Id.).

The undersigned find that the ALJ erred in failing to obtain plaintiff's school records. The most recent school records available are from 2007, when plaintiff was in the third grade. As the ALJ noted, these records reveal that plaintiff was achieving satisfactory grades and did not have any disciplinary issues. Plaintiff's mother testified that plaintiff received good grades and was even on the honor roll when he was in third grade, but reported that his grades subsequently

- 20 -

declined and he was earning "D"s and "F"s at the time of the September 2009 hearing. (Tr. 48).

Plaintiff's mother's testimony regarding a decline in plaintiff's grades and behavior at school is

consistent with reports she provided to plaintiff's treating mental health providers. (Tr. 314, 296,

266, 329, 405). All of these providers found plaintiff's mother to be reliable. (Id.).

The ALJ acknowledged plaintiff's mother's testimony that plaintiff received failing grades

at the time of the hearing, but determined that her allegations were not credible due to the failure

of plaintiff's attorney to submit these records. The record, however, contains other references to

plaintiff's difficulties in school. For example, in a Child & Family Assessment conducted in

December 2007 by Pamela Fox, MA, at Crider Health Center, it is noted that plaintiff was in

fourth grade and was "currently failing in several subjects." (Tr. 317). Ms. Fox also noted that

plaintiff had received in-school suspensions, out of school suspensions, and was experiencing

"academic problems." (Id.). Ms. Fox stated that plaintiff "was suspended before Christmas break

for 10 days + recently had 3 days ISS." (Id.). Ms. Fox indicated in her assessment that, in

addition to plaintiff and his mother, plaintiff's school counselors were "informants" used to

conduct the assessment. (Tr. 312). Thus, the record is supportive of plaintiff's mother's

allegations of a decline in plaintiff's grades and behavior at school after third grade. Under these

circumstances, the ALJ had an independent duty to obtain plaintiff's up-to-date school records.

Plaintiff also argues that the ALJ erred in weighing the medical opinion evidence. In

analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various

treating and examining physicians'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001)

(quoting <u>Bentley v. Shalala</u>, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." <u>Rhodes v. Apfel</u>, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting <u>Metz v. Halala</u>, 49 F.3d 374, 377 (8th Cir. 1995)). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." <u>Prosch v. Apfel</u>, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). Such opinions, however, do "not automatically control, since the record must be evaluated as a whole." <u>Id.</u> at 1013 (quoting <u>Bentley</u>, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" <u>Id.</u> (quoting <u>Rogers v. Chater</u>, 118 F.3d 600, 602 (8th Cir. 1997)).

With regard to the opinion evidence, the ALJ indicated that he was assigning "great weight" to the opinion of state agency psychologist Dr. McGee, and "little weight" to the opinions of consulting counselor Mr. Davis and consulting psychologist Dr. Lipsitz. (Tr. 21).

On February 26, 2008, Dr. McGee completed a Childhood Disability Evaluation Form. (Tr. 250-54). Dr. McGee found that plaintiff's ADHD and bipolar disorder were severe but did not meet, medically equal, or functionally equal the listings. (Tr. 250). Dr. McGee expressed the opinion that plaintiff had less than marked limitation in the domains of Attending and Completing Tasks, Interacting and Relating with Others, and Caring for Yourself; and no limitation in the domains of Acquiring and Using Information, Moving About and Manipulating Objects, and Health and Physical Well-Being. (Tr. 252).

The undersigned finds that the ALJ erred in relying on the opinion of non-examining state agency psychologist Dr. McGee. The ALJ acknowledged that additional evidence had been added to the record since Dr. McGee provided her opinion, and that Dr. McGee did not have the benefit of examining the claimant, yet nonetheless found that Dr. McGee was a "specialist" and that her opinion was "widely consistent with the overall evidence of record." (Tr. 21).

The medical evidence reveals that plaintiff experienced significant psychiatric symptoms beginning around the end of 2007. Plaintiff was hospitalized from November 7, 2007, through November 10, 2007, after threatening to harm a teacher at school. (Tr. 361). Plaintiff admitted that he threatened to kill himself and the teacher together and showed no remorse regarding the incident. (Id.). It was also noted that plaintiff had tried to hurt his mother and others, and experienced sudden mood swings and anxiety daily. (Tr. 401). Plaintiff was found to be a danger to himself and others and received medication management until he was stabilized. (Tr. 361, 402). In December 2007, plaintiff presented to counseling at Catholic Family Services with reports of outrage, anger, and being uncontrollable. (Tr. 246). Plaintiff had a sullen demeanor, and was diagnosed with generalized anxiety disorder. (Id.). Plaintiff later spoke to a police officer about his behavior. (Tr. 281). On December 20, 2007, Ms. Fox noted that plaintiff seemed very angry at other kids and indicated that he wanted to hurt them, and also reported suicidal thoughts about hanging himself. (Tr. 323). While Ms. Fox described plaintiff as "very smart," he was irritable and argumentative during his examination, and exhibited magical thinking. (Tr. 326). Ms. Fox expressed concern regarding the seriousness of comments plaintiff made regarding hurting himself and others, and diagnosed him with bipolar disorder and ADHD. (Id.).

Plaintiff denied any thoughts of harming himself or others in December 2008. (Tr. 300). When plaintiff initially presented to Dr. Kent in July 2009, it was noted that plaintiff had not recently been out of control, although plaintiff reportedly "quit trying" in school and performed poorly the past school year. (Tr. 296). Plaintiff's mood was fair and he was diagnosed with stable bipolar type I disorder and ADHD. (Tr. 297). In a September 2009 MHS review, it was noted that plaintiff continued to struggle with social skills, self-esteem issues, communication issues, and possibly attachment issues. (Tr. 309). In October 2009, Dr. Kent noted that plaintiff had received in-school and out-of-school suspensions for disruptive and aggressive or "silly" behaviors. (Tr. 329). Dr. Kent found that plaintiff's mood was labile and plaintiff admitted to getting angry quickly. (Id.). Dr. Kent diagnosed plaintiff with bipolar type I disorder, labile; and ADHD; and increased plaintiff's dosages of medication. (Id.).

In light of the evidence discussed above, it cannot be said that Dr. McGee's findings that plaintiff has "less than marked" limitation in the domains of Attending and Completing Tasks, Interacting and Relating with Others, and Caring for Yourself is consistent with the evidence of record. "[T]he opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." Cunningham v. Apfel, 222 F.3d 496, 502 (8th Cir. 2000). As the ALJ noted, not only did Dr. McGee not examine plaintiff, but she did not have the benefit of reviewing plaintiff's more recent medical records. This evidence reveals that plaintiff continued to experience significant psychiatric symptomatology and experienced behavioral problems in school.

The ALJ indicated that he was assigning little weight to the opinions of Mr. Davis and Dr.

Lipsitz because these opinions appeared to be based on plaintiff's subjective complaints and these sources were not treating providers but were only one-time consultants. Plaintiff saw Mr. Davis for an evaluation in September 10, 2009. (Tr. 263-67). Mr. Davis noted that plaintiff had difficulties remaining focused throughout the interview, required redirection, and periodically would get out of his seat to move around the conference room. (Tr. 266). Plaintiff denied any thoughts of harming himself or others. (Id.). Plaintiff's mother reported significant difficulties plaintiff had been experiencing at school and at home. (Tr. 266-67). Mr. Davis expressed the opinion that plaintiff was markedly limited in the majority of areas assessed, and moderately limited in the remaining areas. (Tr. 263-64). The ALJ accurately pointed out that Mr. Davis did not conduct any testing, nor is there a documented mental status examination. The ALJ's finding that Mr. Davis' opinion appears to be based solely on plaintiff's subjective complaints is also supported by the record. In fact, Mr. Davis states in his report that "[plaintiff] and his mother report that he has the following symptoms..." (Tr. 267). Thus, the ALJ provided sufficient reasons for assigning little weight to the opinions of Mr. Davis.

Plaintiff argues that the ALJ erred in discrediting the opinions of Dr. Lipsitz. Plaintiff saw Dr. Lipsitz for a psychological consultation at the request of the state agency in October 2009. (Tr. 405-08). Upon mental status examination, Dr. Lipsitz found that plaintiff appeared in some acute distress, his affect was bright, his mood was one of anger, he tended to be somewhat impulsive, and he showed a flight of ideas and push of speech. (Tr. 407). Dr. Lipsitz found that plaintiff's intellectual functioning appeared to be within the borderline range; his short-term memory was deficient; his general range of knowledge appeared to be quite narrow; his social

awareness and judgment were poor; his knowledge of mathematic functions was poor; and his thought processes were primarily preoccupied with his anger, mood swings, the opposite sex, and his difficulty relating within society. (Id.). Dr. Lipsitz diagnosed plaintiff with bipolar disorder, oppositional defiant disorder, rule out ADHD, borderline intellect, and a GAF score of 50. (Id.).

As support for assigning little weight to Dr. Lipsitz's opinions, the ALJ noted that Dr. Lipsitz did not have a treating relationship with plaintiff, his opinion appeared to be based on the subjective complaints from plaintiff and his mother, and his findings were not supported by the overall evidence of record. (Tr. 21-22). There is no indication in Dr. Lipsitz's report, however, that he based his findings on the subjective complaints of plaintiff or plaintiff's mother. Rather, Dr. Lipsitz described detailed findings he observed upon mental status examination. (Tr. 407). While the ALJ discredited Dr. Lipsitz's opinion, in part, because he did not have a treating relationship with plaintiff, none of plaintiff's treating providers expressed an opinion regarding plaintiff's limitations. Dr. Lipsitz did examine plaintiff on one occasion, whereas Dr. McGee's opinions are based solely on her review of the record.

The majority of Dr. Lipsitz's findings are supported by the record. The only finding that lacks support is Dr. Lipsitz's diagnosis of borderline intellect. There is no other indication in the medical or school records that plaintiff's intellectual functioning is deficient. In fact, plaintiff's teachers described him as "bright," and even "brilliant." (Tr. 120).

In sum, the record reveals that plaintiff suffered from significant psychiatric symptoms, including mood disturbances, and thoughts of harming himself and others. The record also lends support to plaintiff's mother's testimony that plaintiff's grades and behavior declined after the

third grade.  The ALJ, however, failed to fully develop the record by obtaining plaintiff's up-to-date school records.  The ALJ also erred in relying on the opinion of a non-examining state agency psychologist, when the psychologist's opinion was not supported by the record and she did not have the benefit of reviewing plaintiff's more recent medical records.  While the ALJ provided some sufficient reasons for discrediting the findings of the consultative examiners, this simply underscores the fact that there is no evidence from any treating sources regarding plaintiff's limitations.

Plaintiff also argues that the ALJ failed to consider a structured setting, and that the ALJ improperly considered plaintiff's failure to follow prescribed treatment.  The undersigned finds that these additional arguments lack merit.  The decision of the Commissioner will be reversed and remanded on the grounds previously discussed.

### Conclusion

The ALJ erred in failing to fully and fairly develop the record by obtaining plaintiff's complete school records.  The ALJ also erred in relying on the opinion of a non-examining state agency psychologist.  The ALJ's determination that plaintiff has less than marked limitation in the domains of Attending and Completing Tasks, Interacting and Relating with Others, and Caring for Yourself is not supported by substantial evidence in the record as a whole.  For these reasons, this cause will be reversed and remanded to the ALJ in order for the ALJ to properly develop the record by obtaining plaintiff's complete school records; obtain additional medical evidence regarding plaintiff's limitations; and re-evaluating plaintiff's limitation in the domains of Attending

and Completing Tasks, Interacting and Relating with Others, and Caring for Yourself.

Accordingly, a Judgment of Reversal and Remand will be entered separately in favor of plaintiff in accordance with this Memorandum.

Dated this 6th day of March, 2013.

_Lewis M. Blanton_
LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE